```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ----------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                                     Case No. 20-cr-21
 5       -vs-

 6  GRAFTON E. THOMAS,

 7                       Defendant.

 8  ----------------------------------------x

 9                                   White Plains, New York

10                                   May 27, 2020
                                     9:06 a.m.
11
                   ** VIA VIDEO CONFERENCE **
12

13  B e f o r e:

14                                   HONORABLE CATHY SEIBEL

15                                   District Judge

16
    A P P E A R A N C E S:
17
    GEOFFREY S. BERMAN
18       United States Attorney for the
         Southern District of New York
19  LINDSEY KEENAN
    LARA K. ESHKENAZI
20  MICHAEL K. KROUSE
         Assistant United States Attorneys
21
    SUSSMAN & WATKINS
22  MICHAEL SUSSMAN
         Attorney for Defendant
23
    LAW OFFICE OF BONNI STERNHEIM
24  BOBBI STERNHEIM
         Attorney for Defendant
25
```

```
 1  A P P E A R A N C E S:   (CONT.)

 2


 3  ALSO PRESENT:

 4  GRAFTON E. THOMAS, Defendant
    MICHAEL ARCHER, Investigator
 5  DREW CAPROOD, Investigator
```

1             THE COURT:  Good morning, everyone.  I called this
2  conference because last week I got some information from the
3  marshals regarding my order, which I believe was April 26th
4  under 4241 -- and the marshals, I want to be clear, are not at
5  fault here, nor is the U.S. attorney -- but it's a different
6  branch of government that's at fault from what I can tell.  What
7  I was informed -- first I was informed that the marshals were
8  not planning on moving Mr. Thomas until July, and then I learned
9  it was actually October.
10            BOP designated him fairly expeditiously to go to
11 Springfield for the treatment mandated by 4241(d), and the
12 marshals' transportation people worked reasonably quickly on
13 when they could move him.  Indeed, our local marshals were
14 willing to take Mr. Thomas directly without waiting for the
15 airlift; but the problem is, I am told, that BOP has very few
16 beds for this sort of treatment, and the backlog is such that
17 there is no point in moving anybody to Springfield until the
18 third week in October because there are 32 people on line to go
19 there.  Mr. Thomas is number 30, and they only accept six per
20 month.  This apparently has to do with the fact that BOP does
21 not have enough forensic psychologists and other resources to do
22 what they need to do.
23            This struck me as unacceptable, and I wanted to gather
24 the parties to get their views about what we should do about
25 this situation.  It seems to me there is two problems here:  One

1   is the statute envisions a four-month study and what -- and
2   treatment, and what BOP is proposing is to not even commence the
3   treatment until six months have passed; and there is a
4   humanitarian side to this.  If somebody had a broken leg, you
5   wouldn't make him wait six months to get treatment.
6           So I am looking first to the government for any
7   information it would like to provide, and then I am going to ask
8   Ms. Sternheim and Mr. Sussman what they think we ought to do.
9           MS. KEENAN:  Good morning, Your Honor.  Since the
10  government received the information from the marshals about the
11  marshals' transportation service request for an extension of the
12  time to move Mr. Thomas, I have spoken with a number of
13  different people with the marshals service and with the BOP.
14          I understand that there is a line-jumping procedure
15  for, you know, although Mr. Thomas is currently number 30 out of
16  32 people in line to be moved to Springfield, it's possible for
17  him to be advanced in that line based on two factors:  The first
18  factor would be if he is experiencing clinical decompensation,
19  and the second factor would be whether Westchester County Jail
20  is able to appropriately treat his clinical decompensation.
21          I spoke with Dr. Dia Boutwell, who is a medical
22  designator for the BOP, and she advised me of the kind of
23  documentation that the BOP would need to assess whether it's
24  appropriate to advance Mr. Thomas, and then I spoke with Dr.
25  Jerome Norton, who is the director of mental health services at

1  Westchester County Jail.

2  Dr. Nortwell is gathering the information that Dr.
3  Boutwell requested, and I understand that he sent at least some
4  of that information to her on May 21st.

5  She wasn't able to give me an estimate of how long it
6  would take to assess the request, but my understanding is that
7  request is under consideration right now.  Unfortunately, all 32
8  inmates who are in line to be moved to FMC Springfield are in
9  the exact same position as Mr. Thomas in that they are pretrial
10 and awaiting a 4241(d) restoration of competency stay; but she
11 was clear that there are situations in which advancement occurs.
12 So our hope is that this will be one such situation.

13 THE COURT:  Well, I appreciate your having done that
14 digging.  It's not really satisfactory for several reasons:  One
15 is it may be that Mr. Thomas isn't in as bad a way as necessary
16 to jump the line.  Even if he is, it's a larger problem, which
17 is there are 32 people who are all being affected by Bureau of
18 Prisons not doing its job.  So I think it's totally fine to
19 pursue that route, but -- and, you know, Mr. Thomas isn't in any
20 visible distress, but of course, that doesn't mean much, but
21 there is, you know, a hospital right next to Westchester County.
22 So it wouldn't shock me if BOP decided that the jail was
23 actually a safe place for Mr. Thomas.

24 And, you know, the more fundamental problem here is
25 that you've got an executive agency that has obligations that

1  it's not meeting.  You know, if they were not feeding the
2  inmates, we wouldn't say, well, we will just wait until they
3  can.
4              So did you get any sense from Dr. Boutwell as to how
5  BOP got itself into this hole?
6              MS. KEENAN:  I got a sense from Adam Johnston, who my
7  supervisor spoke to.  He is the original counsel for the BOP,
8  and it seems like there are multiple sources for the backlog.
9  One is that Your Honor's order, which was issued on April 20th,
10 like a number of other orders, came in the middle of the
11 pandemic.  Unfortunately, many BOP physicians are diverted to
12 treating the pandemic and responding to pandemic-related
13 motions; and just as a general matter, all prison movements
14 throughout the BOP are slowed by safety matters in place to
15 limit the spread of the pandemic.
16             THE COURT:  That could all be true, but it doesn't
17 sound like it has anything to do with our problem.  It's not the
18 designation took too long; it's that they say they don't have a
19 bed.  So, I mean, even if people were diverted to the pandemic,
20 they within 30 days, within two weeks I think had designated
21 Mr. Thomas.  If the problem is that there are people in beds at
22 Springfield who no longer need to be there, but they can't be
23 transported out, you know, that, I thought, was going to change
24 in June.  I don't know if that's what BOP meant.  In other
25 words, if the reason there are no beds in Springfield is because

1  there are people who are finished with their 4241(d)
2  proceedings, but because of the pandemic they haven't been
3  moved, that would be a little more understandable, but they've
4  got to move those people is what they've got to do.  And our
5  marshals are willing to move Mr. Thomas, so I have to imagine
6  the BOP has begun to figure out how they are going to start
7  doing prisoner movements, and I have in the back of my mind that
8  they were going to start in June, which is now just a few days.
9           You know, they are going to have to quarantine people
10 when they arrive at a new facility, but did Mr. Johnston
11 attribute the problem to anything else?
12          MS. KEENAN:  No, Your Honor.  My understanding is that
13 the way you phrased it did sum up the problem; that there are
14 people in beds at Springfield whose evaluations or restorations
15 are taking longer than they ordinarily would because there are
16 fewer doctors available and that movements generally are slow
17 and contributing to the backlog of 32.
18          THE COURT:  I am not faulting you, Ms. Keenan, but
19 this is a very unsatisfactory state of affairs.
20          Mr. Sussman, Ms. Sternheim, what is your position?  I
21 apologize for my dog.  What's your position on what we should
22 do?
23          MR. SUSSMAN:  Your Honor, Michael Sussman here.
24          Ms. Sternheim and I did have a chance to discuss this.
25          Good morning, Mr. Thomas.

1             I understood, Your Honor, and we have had no
2  information, so what I am hearing from the Court, respectfully,
3  is the first that I am hearing essentially any of this.  So if I
4  am responding somewhat off-the-cuff, it's because I haven't
5  really had a chance to process it entirely.  If I am
6  understanding what the Court is saying, and only six individuals
7  a month can be taken into the facility, which is what I think I
8  heard you say, then even if he is somewhat jumped, you are still
9  talking probably months of further delay.  That's my impression.
10            The other point that I thought was clear, and maybe I
11 didn't understand this from the beginning, is that there were
12 two other facilities we had heard about, Devens and Butner.  I
13 am not understanding exactly the Springfield thing.  Again, I
14 have been in the dark as to this.  Is this the only facility
15 that's available?
16            THE COURT:  What I was told is that right now there
17 are three medical centers:  Butner, Devens and Springfield.
18 Devens is not doing 4241 evaluations, and Butner is a little
19 better than Springfield.  Butner is taking four per week as
20 opposed to six per month in Springfield, but they have 48 people
21 in the pipeline.  So they won't have a bed until the third week
22 in October, either; and apparently, BOP has a procedure for
23 deciding which facility you are going to go to based on your
24 medical needs, the kind of evaluation that's needed, security
25 level, whatever, but Butner is not going to do any better than

1  Valhalla and Springfield.
2           MR. SUSSMAN:  Thank you for that.  We didn't have that
3  information, at least I didn't.
4           THE COURT:  If you want to confer with Ms. Sternheim
5  for a moment offline, I am happy to pause for you to do that.  I
6  don't mean to put you on the spot.
7           MR. SUSSMAN:  No, no.  I mean, Ms. Sternheim can speak
8  as well.  She is more experienced in these matters than I am.
9           In any event, look, I don't really see much
10 alternative.  I heard this idea that he could jump the line, but
11 I also should point out to the Court -- you may know this
12 independently.  While the BOP evaluators, forensic evaluators
13 found Mr. Thomas unfit, as did Dr. Levin, the Westchester County
14 evaluators who viewed him and spoke with him and reported back
15 to the state court, found him fit.
16          So in terms of jumping the line and the persuasiveness
17 of their position, if they were asked their own opinion, I don't
18 know what they could say.  That's a concern of mine, and I am
19 hearing that the other people would be giving information, but
20 they didn't even agree in the beginning.  I don't know if that's
21 going to play a factor, but you should know that, Your Honor,
22 certainly.
23          THE COURT:  Well, that is of interest.  I mean, one
24 thing I was wondering-slash-hoping is that Mr. Thomas has been
25 getting some treatment, and maybe he is better than he was when

1  the defendant's doctor and the MCC doctor spoke to him.  I don't
2  know if you have any information on that score.  I don't know if
3  the Westchester evaluators concluded that Mr. Thomas had
4  improved since the previous evaluations or if they just had a
5  different professional opinion.
6           MR. SUSSMAN:  They had a different opinion.  Theirs
7  actually preceded BOP by a considerable period of time, I think.
8  So it's not -- the latter one was the one for BOP.
9           I mean, the other point to make -- and, again, I have
10 no credentials to make a professional opinion on this -- but I
11 did have conversations, as I mentioned to the Court, with
12 Mr. Thomas, at your urging, Your Honor, and I must say again
13 with all due regard, that conversation did not lead me to feel
14 that there was any improvement whatsoever.  Quite the contrary.
15          Now, again, I am not -- I have no ability to make any
16 definitive opinion.  It was a six-minute conversation.  I was
17 attempting to explain this call and what the issue was, at least
18 as I then understood it.  But I am happy to have Dr. Levin, if
19 the Court wishes, go again if he is allowed.  I mean, I haven't
20 been allowed into the facility.  Mr. Archer and Mr. Caprood have
21 been allowed in once or twice, and at my suggestion have gone to
22 see Mr. Thomas since we didn't want him to feel so isolated,
23 frankly.  His mother hasn't been able to see him.  Nobody has
24 been able to see him for, as you know, months.  They have been
25 allowed to see him I think twice, which has been helpful.

1  　　　　　If the Court would like, I could ask Dr. Levin to
2  speak with him again, and if he felt there was any change, and
3  he is a professional, I would certainly ask him to advise and we
4  would notify you with any view; but I, frankly, think that's
5  remote.
6  　　　　　THE COURT:  I am not requesting that.  If that's
7  something you want to do, you're welcome to.
8  　　　　　MR. SUSSMAN:  I try to be helpful.
9  　　　　　THE COURT:  I appreciate it.
10 　　　　　So, Ms. Sternheim, do you want to chime in at all?
11 　　　　　MS. STERNHEIM:  No, Your Honor.  I have nothing to add
12 besides what Mr. Sussman said at this time.  Thank you, though.
13 　　　　　THE COURT:  So --
14 　　　　　MS. KEENAN:  If I could just allay Mr. Sussman's
15 concerns briefly.  I don't believe that the two forensic
16 examiners who conducted the examination of Mr. Thomas for
17 Rockland County's purposes will be providing information to the
18 BOP regarding Mr. Thomas's current state and treatment.  My
19 understanding is that they are contracted to perform that
20 evaluation service, but that the information provided to BOP
21 will come from his regular mental health care provider, who is
22 Dr. Norton.
23 　　　　　MR. SUSSMAN:  Great.  Very well.  Thank you for that.
24 　　　　　MS. KEENAN:  Of course.
25 　　　　　THE COURT:  Well, I don't --

1          MR. SUSSMAN:  You know, Judge, I thought -- may I say
2  one other thing?  I hear the Court's frustration, which we
3  obviously, frankly, share.  We would like -- you know, the state
4  court proceeding is being held in abeyance now as well.  As you
5  may know, the judge there took our suggestion and said, you
6  know, we have to go through this process federally, and Mr.
7  Thomas can't be in two places at once, and if he is going to be
8  in a facility, he obviously can't be appearing in any form or
9  fashion for a competency hearing or otherwise in state court.
10         So I have to, obviously, advise the Court of this; but
11 I don't really see, given the executive branch's behavior
12 through Bureau of Prisons what the Court could do.  You could
13 have a hearing, but I don't know what -- you know, what are we
14 going to get from that?  You know, I feel very frustrated
15 because I would like to see some resolution for my client's
16 sake, honestly; and I would like him to be in a treatment
17 facility longer term, which is where I think he needs to be.
18 That's the ultimate issue here, and we can't reach that issue
19 until we go through this process, and I appreciate that.  But I
20 don't see what -- I don't really see what you could do, with all
21 due respect to your authority.
22         THE COURT:  Yes.  I mean, I guess I could make the
23 attorney general come here and tell me why BOP doesn't have
24 enough doctors and enough beds when clearly there are many more
25 people who need treatment under 4241(d) than they are prepared

1 to handle.
2          And, you know, I probably am going to require
3 something along those lines, although probably not the attorney
4 general himself, but, you know, looking at the statute, it is --
5          MR. SUSSMAN:  Obligatory.
6          THE COURT:  It says, "The hospitalization shall not
7 exceed four months."  It actually doesn't have in it a time
8 limit for how long it should take to get the defendant to the
9 hospital.  It says, "The attorney general shall hospitalize the
10 defendant for treatment in a suitable facility for such
11 reasonable period of time not to exceed four months as is
12 necessary to determine whether there is a substantial
13 probability that in the foreseeable future he will attain the
14 capacity to permit the proceedings to go forward and any
15 additional time needed for treatment."
16          What it ought to say is -- and I am sure BOP is aware
17 that it doesn't say -- you got to get him into a hospital within
18 30 days or 45 days.  Then it sort of becomes a matter of Speedy
19 Trial Act --
20          MR. SUSSMAN:  Right.
21          THE COURT:  -- which has an exception for just this
22 situation.  Although I don't think anybody envisioned a backlog
23 like this.  But 3161(h)(1)(A) allows for an exclusion of time
24 for any period of "delay resulting from," among other things,
25 "any proceeding, including examinations to determine mental

1  capacity -- mental competency," as well as under Subsection F
2  for, "delay resulting from the transportation of the defendant
3  to and from places of examination or hospitalization, except
4  that any time consumed in excess of ten days from the date of
5  the order of removal or an order directing such transportation,
6  and the defendant's arrival at the destination shall be presumed
7  to be unreasonable."
8          Well, I had not focused on that.  So the four months
9  is excludable under (h)(1)(A).  Only ten days is excludable
10 under (h)(1)(F).
11         So what's the government's view on how it's going to
12 account for the remaining five months and 20 days that it's
13 going to take to transport Mr. Thomas to Springfield?
14         MS. KEENAN:  I think, Your Honor, that (h)(1) -- I am
15 sorry -- (h)(4), "Any period of delay resulting from the fact
16 that the defendant is mentally incompetent or physically unable
17 to stand trial," would be the appropriate exclusion, which I
18 believe is the BOP's position right now.
19         THE COURT:  Well, yes and no.  I mean, the (h)(1)(F)
20 seems to be kind of on point.  I think the way I read it is
21 (h)(1)(4) is for a period of time that the defendant is mentally
22 incompetent.  I guess that began with my order, theoretically.
23 I guess one could read it as saying that (h)(1) is relevant to
24 the period before such a finding; that it excludes time for a
25 proceedings to determine mental competency, which have already

1  occurred, and it excludes time for a delay resulting from
2  transportation for those pretrial -- the pre-determination
3  examinations, but once there's been a determination, (h)(4)
4  kicks in, and that's what's applicable now.
5          I haven't looked at the law.  I am just saying that's
6  one way to read it.
7          But I invite the defense to do some research, and I am
8  happy to be informed if the ten-day provision applies after a
9  defendant has been found mentally incompetent, or if there is
10 any other temporal limitation on how long the government can
11 mess around in getting treatment.  I understand the defendant is
12 being treated in the jail.  I don't mean to suggest otherwise,
13 but he needs, obviously, an intensive forensic evaluation and
14 treatment to restore competency which I gather has -- even if
15 based on armchair psychology -- has not yet occurred, and that's
16 not fair to either Mr. Thomas or to the public, which naturally
17 would like to see the defendant restored to competency and the
18 case adjudicated.
19         MR. SUSSMAN:  We will do our research, and we will get
20 back to you within a week on that.
21         THE COURT:  All right.  If the government's right, I
22 don't have to make a finding.  It's an automatic exclusion.  If
23 the defense makes a submission, obviously, the government can
24 respond.
25         So let's just set some dates so we don't lose track

1  and, you know, if, Mr. Sussman, you do your research and it

2  turns out the government's right, you don't have to submit

3  anything; but I will look for something from the defense

4  June 3rd and the government June 10th, and we will take it from

5  there.

6              MR. SUSSMAN:  The facts that we are going to be

7  predicating our submission on, Your Honor, just to be clear,

8  what I have heard from the Court and, obviously, from Ms. Keenan

9  in this conversation, obviously, it could be a shifting set of

10 facts, but I am going to be writing, if I write based on the

11 facts I understand the Court and Ms. Keenan to have laid out

12 because I don't have -- as I said to you earlier -- any

13 independent way of knowing the situation in any detail.

14             THE COURT:  Yeah, and all -- I have passed on to you

15 what the marshals have passed on to me, and the marshals got it

16 from BOP.

17             I gather, Ms. Keenan, you haven't heard anything

18 different than what I heard?

19             MS. KEENAN:  I haven't heard anything different, and I

20 think the majority of what Your Honor learned from the marshals

21 was information that was included in the email that Walter

22 forwarded to all parties in setting this conference.

23             MR. SUSSMAN:  All I am saying is in terms of my

24 submission, if the government is going to come up with a

25 different set of facts, at that point then, obviously, my

1  submission will be in apposite, and I appreciate that, but I
2  don't have any way of verifying it.  So I am going to just write
3  and research based upon what I have heard.  That's all I am
4  trying to make clear.
5          THE COURT:  That's fine.  And the government is not
6  going to play games.
7          MR. SUSSMAN:  Exactly.
8          THE COURT:  If things change, if, for example,
9  Mr. Thomas does jump the line, I am sure the government will
10 notify all of us ASAP.
11         MR. SUSSMAN:  Thank you.
12         THE COURT:  And just for the record, we got a lengthy
13 email dated May 15th from BOP, which I -- from the marshals,
14 which I think is what Ms. Keenan was referring to, and I gather
15 my court deputy shared it with the parties, and then I had some
16 further email conversation with the marshals, the bottom line of
17 which was that the third week in October is the best they could
18 do.  If that changes, I am sure Ms. Keenan or one of her
19 colleagues will notify us ASAP.
20         And I will think about whether I am going to order
21 anybody at BOP to show cause why this hasn't been handled more
22 competently, no pun intended, but it just seems like a
23 completely unacceptable state of affairs that people who are in
24 need, the most in need of treatment are having to wait this long
25 for it.

1          So if either side wants to suggest in their
2 submissions who on the -- who or how I should call BOP on the
3 carpet, I am open to suggestions.
4          MR. SUSSMAN:  Thank you very much, Judge.
5          THE COURT:  All right.  Anything else we should do
6 this morning?
7          MS. KEENAN:  Not from the government.
8          Michael, if there is any information that I proffered
9 this morning that you want to further discuss, I am obviously
10 available to do that at any point.
11         MR. SUSSMAN:  Thank you very much.  I appreciate your
12 cooperation.
13         Thank you, Your Honor, for your courtesies.
14         THE COURT:  All right.  Thank you all, and thanks to
15 the folks at Valhalla, as usual.  All right.  To be continued.
16         (Time noted:  9:37 a.m.)